UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| ROBERT MORRIE HAYES, | Case No. 3:20-cv-00631-MMD-CSD |
|---|---|
| Plaintiff, | ORDER |
| v. | |
| KYLE OLSEN, *et al.*, | |
| Defendants. | |

## I. SUMMARY

Respondents have answered Robert Morrie Hayes' 28 U.S.C. § 2254 habeas corpus petition challenging his state criminal conviction by jury. (ECF No. 28.) As discussed below, the Court denies the petition.[1]

## II. BACKGROUND

In August 2016, a jury convicted Hayes of five counts of sexual assault with a minor under fourteen years of age and five counts of lewdness with a minor under fourteen years of age. (Exh. 39 at 28-31.)[2] The jury found him not guilty of one count of sexual assault with a minor under fourteen and two counts of lewdness with a minor under fourteen. (*Id.*) Hayes was found guilty of sexually abusing his goddaughter beginning when she was in the third or fourth grade from 2006 to 2009. (*See* Exh. 33 at 16-173.) The state district court sentenced Hayes to an aggregate term of 40 years to life. (Exh. 41.) Judgment of conviction was entered on October 14, 2016. (Exh. 42.)

The Nevada Court of Appeals affirmed Hayes' convictions in November 2017, and the Nevada Supreme Court affirmed the denial of his state postconviction habeas corpus

---

[1]Hayes filed a reply in support of the petition. (ECF No. 32.)

[2]Exhibits referenced in this order are exhibits to Respondents' motion to dismiss, ECF No. 13, and are found at ECF Nos. 10-12.

petition in September 2020. (Exhs. 57, 84.) Hayes filed his federal habeas petition in November 2020. (ECF No. 5.)

## III. LEGAL STANDARDS

### A. AEDPA Standard of Review

28 U.S.C. § 2254(d), a provision of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), provides the legal standards for the Court's consideration of the petition in this case:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693-694 (2002). The Court's ability to grant a writ is limited to cases where "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts

a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer*, 538 U.S. at 73 (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell*, 535 U.S. at 694.

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 74 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id.* (quoting *Williams*, 529 U.S. at 409).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g.*, *Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires substantially more deference:

> .... [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence. The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Cullen*, 563 U.S. at 181.

3

### B.     Ineffective Assistance of Counsel

Ineffective Assistance of Counsel ("IAC") claims are governed by the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court held that a petitioner claiming ineffective assistance of counsel has the burden of demonstrating that (1) the attorney made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment, and (2) that the deficient performance prejudiced the defense. *Williams*, 529 U.S. at 390-91 (citing *Strickland*, 466 U.S. at 687). To establish ineffectiveness, the defendant must show that counsel's representation fell below an objective standard of reasonableness. *See id.* To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *See id.* A reasonable probability is "probability sufficient to undermine confidence in the outcome." *Id.* Additionally, any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct, in order to avoid the distorting effects of hindsight. *Strickland*, 466 U.S. at 689. It is the petitioner's burden to overcome the presumption that counsel's actions might be considered sound trial strategy. *See id.*

Ineffective assistance of counsel under Strickland requires a showing of deficient performance of counsel resulting in prejudice, "with performance being measured against an objective standard of reasonableness, . . . under prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal quotations and citations omitted). When the ineffective assistance of counsel claim is based on a challenge to a guilty plea, the Strickland prejudice prong requires a petitioner to demonstrate "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

If the state court has already rejected an ineffective assistance claim, a federal habeas court may only grant relief if that decision was contrary to, or an unreasonable application of, the *Strickland* standard. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003).

There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *See id.*

The United States Supreme Court has described federal review of a state supreme court's decision on a claim of ineffective assistance of counsel as "doubly deferential." *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). The Supreme Court emphasized that: "We take a 'highly deferential' look at counsel's performance . . . through the 'deferential lens of § 2254(d).'" *Id.* (internal citations omitted). Moreover, federal habeas review of an ineffective assistance of counsel claim is limited to the record before the state court that adjudicated the claim on the merits. *See Cullen*, 563 U.S. at 181-84. The United States Supreme Court has specifically reaffirmed the extensive deference owed to a state court's decision regarding claims of ineffective assistance of counsel:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.* at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S. at 123. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S. at 124. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

*Harrington*, 562 U.S. at 105. "A court considering a claim of ineffective assistance of counsel must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id.* at 104 (quoting *Strickland*, 466 U.S. at 689). "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Id.* (internal quotations and citations omitted).

**IV.   DISCUSSION**

    **A.   Ground 1**

Hayes contends that his trial counsel was ineffective for failing to conduct an adequate investigation, failing to request an independent psychological examination of

5

the victim, and failing to present expert testimony in violation of Hayes' Sixth and Fourteenth Amendment rights. (ECF No. 1 at 17-28.)

### 1. Trial testimony

The victim, A.G., testified at trial that Hayes, her godfather, started to sexually abuse her when she was in third or fourth grade.[3] (Exh. 33 at 16-173.) She recounted that the first time of many occurred in Hayes' white truck. Frequently after school Hayes would pick up A.G. and tell her they were going to McDonald's. On the way he would park in a tile warehouse parking lot and cover the windows with windshield visors. She described in detail how he would watch pornography on his laptop or his MP3 player and then perform oral sex on A.G. Then he would direct A.G. to give him a "hand job." After ejaculating he would clean himself up and discard the tissues in the McDonald's drive-thru trash can. A.G. said that Hayes told her not to tell anyone, that they would both get in trouble, and that her family wouldn't believe her. She described with particularity the interior and exterior of the truck he had at the time. She recalled that he assaulted her at her house on one occasion when she was trying to rehearse for a school play. One time when she was in fourth grade on the way to McDonald's Hayes performed oral sex on A.G., then he penetrated her vagina slightly with his finger. He then directed her to perform oral sex on him, which scared her. She didn't want to do it; instead, she performed a hand job.

She testified that when she had her first communion, she was wearing a white dress and afterwards went with her godparents to a restaurant and then to Sam's Club. Her godmother was still in the store, and Hayes told A.G. to climb in the back seat of the truck and pull down her tights. He climbed back too and rubbed his penis on her anal area. Later they were at Hayes house; A.G. was still in her dress. Hayes unzipped his

---

[3]The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court record. The Court summarizes the same solely as background to the issues presented in this case, and it does not summarize all such material. No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by this Court. Any absence of mention of a specific piece of evidence or category of evidence does not signify the Court overlooked it in considering Hayes' claims.

pants, and she performed a hand job on him. He "waddled" over to the kitchen to get paper towels to clean up.

Another time Hayes got tickets to see the musical Mama Mia. Before the show he took her to a parking lot and performed oral sex on her in his truck and then had her give him a hand job. Another time extended family was swimming at Hayes house. When everyone else went inside, Hayes told A.G. to stay in the pool. He took her hand and put it on his penis. He asked her to try to perform oral sex on him underwater, but she was choking and unable to. Another time at the pool he had her pull her bikini bottoms down and rubbed his penis on her anal area. During another incident she and Hayes were alone at his house. He had her remove her bottoms and he rubbed his penis on her anal and vaginal area until he ejaculated. She recalled a time when he put her on his bathroom counter and performed oral sex on her. She testified that once her godparents had friends over. When everyone else was outside Hayes performed oral sex on her in his office until the door chimes sounded indicating that someone had come into the house. A.G., her father, and Hayes were on a boat on Lake Mead on one occasion. Her father got off the boat in search of the restroom and Hayes performed oral sex on A.G. on a bed in the lower area of the boat.

The State entered into evidence several photos of A.G. with Hayes and her godmother. In some she was wearing the bathing suit she had described that she had on during the pool encounters. A.G. testified that finally one time on the way to McDonald's she told him that she didn't want to do it anymore. She had been rehearsing telling him. She said he looked shocked and said ok, you just have to promise me you won't tell. A.G. testified that there about two more McDonald's trips after that where he assaulted her and then it stopped.

A.G. stated that the abuse made her afraid of boys and men, even other family members. When she was in seventh grade, she told her friend at a sleepover that her godfather used to abuse her. She told another friend when she was in seventh grade, and in ninth grade she told her boyfriend. When her boyfriend broke up with her there

7

were rumors going around, and she worried that he would tell everyone about Hayes. She began having anxiety attacks and stomach problems, and she started cutting and burning herself. Ultimately, she told the school nurse, psychologist, and police that Hayes had abused her.

On cross-examination defense counsel explored some discrepancies between A.G.'s trial testimony and statement to police. A.G. testified at trial that when she made the statement to Detective Pena she was spending a week in a treatment facility for her mental health issues, was not sleeping well, and was medicated. She also said they were interrupted several times during the interview. A.G. reviewed a statement she made to Officer Pena as well as her preliminary hearing testimony and agreed that she had not said anything about a Sam's Club parking lot incident in either instance. She also did not tell Pena about an incident before Mama Mia.

A.G.'s two friends testified. N.M. testified that she and A.G. were best friends in eighth grade. (Exh. 34 at 9-19.) She said they were in N.M.'s mother's bathroom getting ready for a party when A.G. confided in her that Hayes had abused her. N.M. said she asked A.G. if she had told her parents or anything or otherwise sought help. N.M. recalled that she and A.G. visited Hayes' house at some point, and A.G. pointed out Hayes as the one to N.M. On cross-examination N.M. said that A.G. had told her that Hayes had performed oral sex on her. She acknowledged that A.G. never said anything about Mama Mia or a boat. She said the jacuzzi rang a bell, but she didn't really remember.

S.B. testified that she had been close friends with A.G. since middle school. (*Id.* at 40-48.) She said that when they were in eighth grade A.G. told her that her godfather had molested her; she was very upset so S.B. didn't ask her any questions.

Clark County School District psychologist Jennifer Guyer testified that A.G.'s freshman English teacher brought her to Guyer because she was upset in class and not acting like herself. (*Id.* at 20-38.) A.G. told her Hayes had been touching her. Guyer's concern was with A.G.'s immediate mental health; she called the parents and discussed

proceeding with the intake interview at Monte Vista, a facility that specializes in children with mental health needs.

Hayes took the stand and testified that he would take A.G. and sometimes her sister to McDonald's, or Starbucks or a convenience store for ice cream about once a week after school. (Exh. 37 at 35-107.) He stated adamantly that he had never inappropriately touched A.G. He specifically testified that he was never alone with A.G. on her communion day and did not abuse her that or the day they were on the houseboat with A.G.'s dad. Hayes stated that his wife was also on the boat that day. He said his friend Linda who had gotten the Mama Mia tickets drove Hayes, A.G., and Linda's granddaughter to the performance and home afterwards. He said he did not sexually abuse A.G. that night. He insisted that he never sexually abused her in his house, pool, or jacuzzi.

He acknowledged on cross-examination that when Detective Pena interviewed him he only said he would bring A.G. to McDonald's about once a week. He didn't mention Starbucks or other places. Hayes told Pena he had a side business re-selling pornographic movies on e-Bay. On direct he had said that the McDonald's drive-thru garbage was on the vehicle passenger side, but the State introduced photos that showed that the garbage can was on the driver's side. He had stated on direct that there were lights around the pool at his home. The State introduced several photos of the pool area and the house at night; the pool area was always dark and in none of the photos could Hayes point out any pool lighting.

A.G.'s father testified that she went with her godparents to go get something to eat and to run errands after her first communion. (Exh. 34 at 49-112.) He also testified that only he and A.G. went with Hayes to the houseboat; Hayes told him the bathroom was broken, and he had to walk a significant distance back up the pier to use a bathroom. He had photos to demonstrate the distance and testified that he was away from the houseboat for about thirty minutes. He specifically recalled that it took about that amount of time because he was on new medication that caused him to need the bathroom. He

stated that when Hayes took A.G. to see Mama Mia, it was Hayes who picked her up in his truck and took her to the show.[4] He recounted a bad panic attack during which A.G. would not tell him what was wrong. That occurred about two weeks before A.G. met with the school psychologist and ended up at Monte Vista. When A.G.'s father learned of her allegations against Hayes, he said that it was like a jigsaw puzzle that suddenly, magically came together. He also brought pictures with him that he took at a family gathering that depicted A.G. and Hayes alone in the jacuzzi together.

A.G. took the stand again. (Exh. 37 at 107-116.) She explained that most of her family views her as a liar and that she had not seen her extended family since she disclosed the abuse.

### 2. State postconviction evidentiary hearing testimony

Clinical and forensic psychologist Dr. Chambers testified at Hayes' evidentiary hearing on his state postconviction petition that Hayes' family retained him about 18 months after Hayes' trial. (Exh. 68 at 5-58.) He said he had concerns about numerous inconsistencies in A.G.'s trial testimony. Chambers cited A.G.'s testimony about the pool and hot tub events. He said she recalled specifically which bathing suit she was wearing but that the details about sexual acts varied wildly between various tellings. (*Id.* at 21-22.) He cited a sexual encounter in Hayes' house where there were at least two versions of events—one in which Hayes went and got paper towels and cleaned up and one where she did. (*Id.* at 23.) Chambers observed that A.G. remembered the incidences beginning when she was in different grades, which he said could be evidence of fabrication. He explained generally that children may fabricate allegations of sexual misconduct in order to create an alibi when they might otherwise get in trouble, for revenge against the person they accuse, or because they seek attention and sympathy.

On cross-examination Chambers acknowledged that he never interviewed the victim in this case or anyone else involved aside from Hayes. Chambers had mentioned

---

[4]However, Hayes' friend who got the tickets testified that she picked up her granddaughter, Hayes and A.G. and drove them to the show. (Exh. 37 at 19-22.)

10

that the victim and her parents had had a fight the night before the allegations supposedly came to light when the victim told the school nurse the next day. He said that he believed that the fight and/or the fact that the victim's boyfriend had just broken up with her could have indirectly motivated her to make up the allegations against Hayes. Chambers also agreed that A.G. was upset because her boyfriend had told friends that she had been sexually abused. Chambers said he had not read the entire trial transcripts, including testimony by A.G. and her two friends that she had disclosed the sexual abuse to them a year earlier.

Hayes' trial attorney Jess Marchese testified. (*Id.* at 59-84.) He stated that he considered having Chambers testify at trial but said "I do kind of find he's just a hired gun. You can pretty much pay him to say whatever you want." (*Id.* at 62.) Counsel expressed reluctance to use psychological expert testimony because he viewed it as too subjective. He agreed that the credibility of the victim was an issue at trial and said that he felt expert testimony by someone without personal knowledge of the victim would not have been helpful to the defense. Marchese stated that it is difficult to persuade a court to grant a psychological evaluation of a sexual assault victim. He did not think he'd be successful filing such a motion and did not think it would be helpful in this case. He thought the victim was an "okay" trial witness with the appropriate affect. (*Id.* at 66.) He said he explored inconsistencies in the victim's various statements during her cross-examination and opined that the jury likely acquitted Hayes of some of the charges based on the inconsistencies.

Marchese testified that he made the strategic decision not to call Chambers. He explained that additional reasons he did not seek a psychological evaluation of the victim included that if the report was not favorable to the defense it would be used by the prosecution, and the fact that the State was not using an expert, along with the general facts and circumstances of the case.

Criminal attorney Gary Modafferi testified that he and Hayes' postconviction counsel had handled a case involving multiple allegations of sexual assault by a

stepdaughter who was estranged from the family. (*Id.* at 85-92.) Dr. Chambers testified in that case, relying only on prior statements of the victim. He testified about false allegations in relation to alibi, deflection, and revenge. He was cross-examined by the State and there was no corroborating evidence. The jury acquitted the defendant on all counts; he recalled that case may have 17 or 18 counts. They spoke to the jury afterward, including about Chambers testimony. Modafferi testified that "after hearing how important it was to have that testimony received by the jury, it became common to include someone like Dr. Chambers in every other case like that." (*Id.* at 88.) Hayes' counsel elicited testimony that Chambers testified in another case of Modafferi's in which the jury acquitted the defendant of all counts of sexual assault of two foster children.

Modafferi acknowledged on cross-examination that Chambers has testified in numerous sexual assault cases in that court and that in many cases the juries convicted. Modafferi stated that in his opinion an expert should always be used in defense of these cases.

### 3. Nevada Supreme Court rejected the ineffective assistance claim

Affirming the denial of his state postconviction petition, the Nevada Supreme Court concluded that counsel was not deficient for failing to call a particular expert or for failing to request an independent psychological examination of the victim:

> First, appellant argues that trial counsel should have called Dr. Chambers as a psychological expert at trial to explain the victim's inconsistencies and possible motive to fabricate the allegations against appellant. At the postconviction evidentiary hearing, trial counsel testified that he had preliminary discussions with Dr. Chambers about appellant's case but ultimately decided not to use the doctor's testimony. Counsel explained that, while he had called the doctor as a witness in other cases, he believed the testimony would be too subjective and would not help given the facts and circumstances of appellant's case. Additionally, counsel was reticent to put an expert on the stand who did not have personal knowledge of the victim, especially in a case like appellant's where the victim's credibility was a crucial issue. Ultimately, after consulting with the doctor and considering the relevance of the testimony, counsel testified that it was his strategic decision not to call Dr. Chambers to testify at appellant's trial, a type of strategic decision this court has recognized as "virtually unchallengeable absent extraordinary circumstances." *Doleman v. State*, 112 Nev. 843, 848, 921 P.2d 278, 281 (1996) (internal quotation marks omitted). There is nothing in the record demonstrating such extraordinary circumstances, and we conclude appellant has not shown that trial counsel was deficient in deciding not to call Dr. Chambers to testify.

12

Additionally, appellant has not shown a reasonable probability of a different outcome had Dr. Chambers testified. Trial counsel cross-examined the victim regarding various inconsistencies, presented numerous witnesses challenging or contradicting the victim's testimony, and the jury acquitted appellant of three charges. At the postconviction evidentiary hearing, Dr. Chambers testified that, had he been called as a witness, he would not have been able to conclude with any reasonable degree of certainty whether the victim's allegations were true and he would not have opined as to the victim's truthfulness. Additionally, as to the possibility that the victim fabricated the allegations because of problems with her parents or a breakup with her boyfriend, there was testimony at trial that the victim disclosed the abuse long before those events, and Dr. Chambers testified that information could have changed his opinion. Accordingly, the district court did not err by denying this claim.

Relatedly, appellant argues that trial counsel should have requested an independent psychological examination of the victim. We conclude appellant has not shown deficient performance or prejudice. Appellant has not shown that a psychological evaluation of the victim would have been appropriate[FN1] where the State did not benefit from a psychological expert, *see Abbott v. State*, 122 Nev. 715, 730, 138 P.3d 462, 472 (2006) (concluding the prosecution generally obtains benefit from a psychological expert when a witness "describes techniques used to determine truthfulness, analyzes the facts of the interview, and/or states whether there was evidence that the victim was coached or biased against the defendant"),[FN2] and there appears to be no reasonable basis to believe that the victim's veracity was adversely affected by her mental or emotional state given that she disclosed the abuse to her friends before the alleged mental or emotional instability. Thus, appellant has not shown a reasonable probability of a different outcome at trial had trial counsel sought a psychological evaluation of the victim. Accordingly, the district court did not err in denying this claim.

[FN1: While the district court concluded to the contrary, we affirm because it reached the right result in denying appellant's claim. *See Wyatt v. State*, 86 Nev. 294, 298, 468 P.2d 338, 341 (1970) ("If a judgment or order of a trial court reaches the right result, although it is based on an incorrect ground, the judgment or order will be affirmed on appeal.").]

[FN2: We disagree with the district court's conclusion that the officer's testimony in appellant's case is akin to the officer's testimony in *Abbott*, wherein we concluded the officer testified as an expert. 122 Nev. at 728-730, 138 P.3d at 471-72.]

(Exh. 84 at 2-5.)

### 4. Hayes does not present a proper claim of actual innocence

Hayes urges that this ground should be considered in the context of actual innocence. (ECF No. 1 at 19.) "[A]ctual innocence" means factual innocence, not mere legal insufficiency. *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992). In *Schlup v. Delo*, 513 U.S. 298, 324 (1995), the Court concluded that a "credible" actual innocence claim

13

"requires the petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial."[5] Dr. Chambers questioned inconsistencies in A.G.'s statements and testimony and explained theories on the reasons that children may fabricate sexual abuse. Chambers specifically testified that "there is no certainty with respect to that process" of "evaluating the reliability of allegations of child sexual abuse." (Exh. 68 at 13.) He also acknowledged that ethical psychologists would agree that you can't make a credibility determination in most cases "with any reasonable degree of certainty." (*Id.*) While Chambers could have highlighted inconsistencies in A.G.'s accounts of events and offered possible explanations, his testimony does not constitute exculpatory scientific evidence that would go to an actual innocence claim.

### 5.     Hayes has not shown counsel was ineffective

Hayes has failed to demonstrate that the Nevada Supreme Court's finding that trial counsel's performance was not ineffective was contrary to or involved an unreasonable application of *Strickland*. Hayes' trial counsel testified at the state postconviction evidentiary hearing that he considered calling an expert. He explained that he weighed the likelihood that the trial court would even permit a psychological examination of the victim, whether such exam would be favorable to the defense, and the general facts and circumstances of the case. He reached the strategic decision not to use an expert. Defense counsel explored the inconsistencies in the victim's testimony at trial. Notably, Hayes was acquitted of two counts. Testimony was proffered by another attorney at the evidentiary hearing that Chambers' testimony was apparently very helpful in certain child

---

[5]Importantly, the Supreme Court has not recognized a free-standing claim of actual innocence. *See, e.g.*, *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013). Instead, a showing of actual innocence can allow a petitioner to pursue constitutional claims on the merits notwithstanding a procedural bar to relief. ("[W]here post-conviction evidence casts doubt on the conviction by undercutting the reliability of the proof of guilt, but not by affirmatively proving innocence, that can be enough to pass through the Schlup gateway to allow consideration of otherwise barred claims." *Lee v. Lampert*, 653 F.3d 929, 938 (9th Cir. 2011).

sexual assault trials. However, the attorney also agreed that many cases in which Chambers testified still resulted in convictions.[6] At trial, the defense tried to suggest that A.G. had reason to fabricate the allegations because she told school officials about it soon after she and her boyfriend had a bad breakup and she feared he would share sexual information around school. But two of A.G.'s friends also testified that she had told them of the abuse about a year before she was ever even dating that boyfriend. Chambers' testimony at the evidentiary hearing was not particularly persuasive, and he would not have been able to testify as to the ultimate question of credibility.

In sum, Hayes has failed to demonstrate that the Nevada Supreme Court's decision was contrary to or involved an unreasonable application of Strickland. *See* 28 U.S.C. § 2254(d). Federal habeas relief is denied as to ground 1.

**B.     Ground 2**

Hayes asserts that the trial court violated his Fourteenth Amendment due process rights when it imposed consecutive sentences in the absence of "preexistent, cognizable and reviewable standards and criteria." (ECF No. 1 at 28-37.)

NRS § 176.035(1) provides that the court "may" run the sentences at issue consecutively or concurrently. Hayes insists that the absence of pre-existing and reviewable criteria for exercising that discretion effectively insulates that decision from appellate review. He states that the only preexisting restraint on this process is the prohibition that "the record does not demonstrate prejudice resulting from consideration of information or accusations founded on facts supported only by impalpable or highly suspect evidence." *Silks v. State*, 545 P.2d 1159, 1161 (Nev. 1976)

---

[6]The Court notes that, in denying Hayes' state postconviction habeas petition, the state district court explained:

> This court is not prepared to create a new standard requiring a forensic psychologist in every case involving claims of sexual assault with a minor, and this appears to be what Defendant desires. There is no basis for such a new standard, and no basis for a finding that it was required in this case. There was substantial evidence to support the jury's verdict, and this court will not second guess the decisions of counsel or the decision of the jury.

(Exh. 73 at 15.)

The Nevada Court of Appeals rejected Hayes' argument that the statute permitting a district court to run sentences concurrently or consecutively violated federal due process:

> The constitutionality of a statute is a question of law that we review *de novo*. Statutes are presumed to be valid, and the challenger bears the burden of showing that a statute is unconstitutional. In order to meet that burden, the challenger must make a clear showing of invalidity." *Silvar v. Eighth Judicial Dist. Court*, 122 Nev. 289, 292, 129 P.3d 682, 684 (2006) (footnotes omitted).
>
> Hayes argues NRS 176.035(1) violates the Due Process Clauses of the United States and Nevada Constitutions because it fails to articulate any pre-existing and reviewable criteria to guide the district court in deciding whether to run multiple sentences concurrently or consecutively. We addressed this issue in *Pitmon v. State*, 131 Nev. „ 352 P.3d 655, 659-60 (Ct. App. 2015), and we determined NRS 176.035(1) is not unconstitutionally vague and does not violate the Due Process Clauses of the United States and Nevada Constitutions.
>
> We conclude Hayes has not demonstrated *Pitmon* was wrongly decided nor shown NRS 176.035(1) is unconstitutional. To the extent he claims his sentences are unconstitutional as applied to him, we conclude the sentences imposed did not violate constitutional standards and the district court did not abuse its discretion by imposing count 2 to run consecutive to count 1 and count 6 to run consecutive to count 2. *See* NRS 176.035(1); 2005 Nev. Stat., ch. 507, § 27, at 2847-75 (former version of NRS 200.366); 2005 Nev. Stat., ch. 507, § 33, at 2877-78 (former version of NRS 201.230); Pitmon, 131 Nev. at 352 P.3d at 660-61.

(Exh. 57 at 2-3.)

Hayes urges that the Nevada statute provides for a legislative presumption that all subsequent sentences run concurrently. (ECF No. 1 at 29.) But the statute merely provides that if the court does not specify whether the sentences run consecutively or concurrently then all subsequent sentences run concurrently. *See* NRS § 176.035(1). He cites *Sheriff of Washoe County v. Martin* for the proposition that, in enacting sentencing laws, the "Due Process Clause of the Fourteenth Amendment requires the State to enact standards for those who apply the law to avoid arbitrary enforcement." (ECF No. 1 at 28 (citing 662 P.2d 634, 637 (Nev. 1983).). But *Martin* is inapposite. There the Nevada Supreme Court considered whether the criminal statutes for card cheating were unconstitutionally vague in violation of federal due process. *See* 662 P.2d at 636-637. The court in *Martin* held that the Due Process Clause requires "explicit standards for those

16

who apply the laws" pertaining to criminal liability, the court was not considering or discussing laws regarding sentencing. *Id.*

Hayes also cites to *Hicks v. Oklahoma* when he insists that Nevada law creates a liberty interest in sentencing procedures protected by the Due Process Clause. (ECF No. 1 at 34 (citing 447 U.S. 343, 346 (1980)).) But in *Hicks*, the petitioner was sentenced by a jury to a mandatory 40-year term under the habitual offender statute. Subsequently, the Oklahoma appellate court held that the statute was unconstitutional. The Supreme Court held that the petitioner's due process rights were violated because he was entitled to have the jury impose his sentence, and if the jury had been properly instructed it could have imposed any sentence of ten years or greater. *See id.* at 345-347.

Hayes further points to the Nevada habitual criminal sentencing procedures, which are found in a separate statute. (*See* NRS § 207.010.)[7] He also argues that other states' sentencing laws and case law support his claim of a federal due process right. This does not bear on Nevada's statute. In short, nothing in the case law or other states' sentencing schemes supports Hayes' contention that Nevada's lack of procedural rights for imposing consecutive versus concurrent sentences violates his Fourteenth Amendment due process rights.

Hayes has failed to demonstrate that the Nevada appellate court's decision on federal ground 2 was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d). Accordingly, ground 2 is denied.

The petition, therefore, is denied in its entirety.

---

[7]In *Walker v. Deeds*, 50 F.3d 670, 672-673 (9th Cir. 1995) the Ninth Circuit Court of Appeals held that Nevada's habitual criminal statute "create[d] a liberty interest in sentencing procedures protected by the Due Process Clause of the Fourteenth Amendment."

## V. CERTIFICATE OF APPEALABILITY

This is a final order adverse to Petitioner. As such, Rule 11 of the Rules Governing Section 2254 Cases requires this court to issue or deny a certificate of appealability ("COA"). Accordingly, the court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate: (1) whether the petition states a valid claim of the denial of a constitutional right; and (2) whether the court's procedural ruling was correct. *See id.*

Having reviewed its determinations and rulings in adjudicating Hayes' petition, the court finds that none of those rulings meets the *Slack* standard. The Court therefore declines to issue a certificate of appealability for its resolution of Hayes' petition.

## VI. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the issues before the Court.

It is therefore ordered that the petition (ECF No. 1) is denied.

It is further ordered that a certificate of appealability is denied.

///

///

///

///

The Clerk of Court is directed to enter judgment accordingly and close this case.

DATED THIS 20th Day of September 2022.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE